Ronald **MAREK**, as Administrator of the Estate of Beth G. Marek, deceased, Plaintiff-Appellant,

v.

**UNITED STATES of America,** Defendant-Appellee.

No. 79–3336.

United States Court of Appeals, Fifth Circuit.

Unit B

March 16, 1981.

Rehearing Denied April 10, 1981.

T. G. LaGrone, Orlando, Fla., for plaintiff-appellant.

Gary L. Betz, U. S. Atty., Tampa, Fla., Susan A. Ehrlich, Anthony J. Steinmeyer, Atty., Alice Daniel, Asst. Atty. Gen., Linda Jan S. Pack, U. S. Dept. of Justice, Civil Div., Washington, D. C., for defendant-appellee.

---

Before MORGAN, FAY and FRANK M. JOHNSON, Jr., Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Ronald Marek, as administrator of the Estate of Beth Marek, brought this Florida Wrongful Death Act suit under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. Plaintiff alleged that the medical malpractice of the agents, servants, and employees of the United States of America resulted in the wrongful death of Beth Marek. Following a nonjury trial, the district court found for defendant. Plaintiff appeals. We affirm.

The district court found the facts to be as follows. In 1975 Ms. Marek, the wife of a sergeant at Patrick Air Force Base, developed chronic tonsillitis. The physicians at the base hospital recommended that she see a civilian ear, nose, and throat specialist for treatment. They gave her a list of civilian doctors, from which she chose the name of Dr. Richard Goldcamp.

On October 24, 1975, Dr. Goldcamp performed on Ms. Marek a tonsillectomy and a fracture of the inferior turbinates at Wuesthoff Memorial Hospital, a private hospital near Ms. Marek's home. She was released on October 26.

On October 30, 1975, Ms. Marek started bleeding from the tonsillectomy site, and she was treated in the emergency room of Wuesthoff Memorial. She returned home, but the bleeding recurred. This time she went to Dr. Goldcamp's office, where he cauterized the left tonsillar fosa with silver nitrate. Ms. Marek again returned home. That evening the bleeding again recurred, and she was admitted to Wuesthoff Memorial. The next morning Dr. Goldcamp sutured the bleeding area. She was discharged on November 2.

On the morning of November 5, Ms. Marek began bleeding again. Her husband called Dr. Goldcamp, who told him to bring her to the emergency room at Wuesthoff Memorial. Before they could leave, however, Ms. Marek began bleeding profusely. The blood began squirting and projecting several feet in pulsating streams from her mouth. Mr. Marek decided he should not take the time to drive to Wuesthoff Memorial, but should take his wife to Patrick Air Force Base Hospital, which was only six blocks from the Marek home. Mr. Marek called Dr. Goldcamp's office to notify them that he was going to Patrick. He went to the bathroom, picked up his wife, and carried her to the car. Blood continued to gush out of her mouth. About halfway to the hospital, Ms. Marek's head tilted back so that the blood began bubbling in her mouth. Her husband reached behind her neck and slid her body down so her head was supported by the seat. When they arrived at the hospital, Mr. Marek carried his wife into the emergency room. Once inside the emergency room, he placed her on a table with the assistance of Dr. Avrohm Faber who was in the emergency room. Mr. Marek told Dr. Faber that the bleeding was resulting from a tonsillectomy. Ms. Marek appeared unconscious to Dr. Faber and an attending nurse; blood was flowing freely from her nose and mouth. She was having difficulty breathing.

A Core 0, which indicated that an emergency necessitated that all available personnel come to the emergency room, was announced over the public address system. Several doctors and other employees of the hospital immediately reported to the emergency room. Meanwhile, Dr. Faber attempted to establish an airway. He could not open her mouth because her jaws were locked in trismus, a muscle spasm, so he attempted to establish an airway by surgical means. When he made his incision,[1] he

---

1. Dr. Faber made the incision in the neck at the thyrohyoid notch, between the hyoid bond and thyroid cartilage. This incision was not a tracheotomy or tracheostomy, which are synonymous terms for an incision made below the cricoid cartilage into the trachea. This incision did not establish an airway, and the district court found that, standing alone, the fact that Dr. Faber made the incision in the wrong place would compel a finding that the required stan-

discovered that an endotracheal tube was already in place. While Dr. Faber had been working on the incision, a Major Least, a nurse-anesthetist who had responded to the Core 0, had performed a nasal intubation, that is, passing an endotracheal tube through the nose.

Once the endotracheal tube was in place, Major Least attempted to ventilate Ms. Marek. Ventilation was difficult, however, because there were some secretions of blood in her lungs, and Major Least found it necessary to suction these secretions. Meanwhile, Ms. Marek's heart was not beating effectively, so several employees began cardio pulmonary resuscitation. Because Ms. Marek's stomach appeared distended, Major Least inserted a nasogastric tube. While inserting the nasogastric tube, the endotracheal tube became dislodged, but it was soon manipulated in place.

Dr. Goldcamp, Ms. Marek's civilian physician, arrived at the hospital about an hour after Ms. Marek was brought there. He asked Dr. Faber to ligate the left external carotid artery to control bleeding in the left tonsillar fosa area. After this was accomplished, Dr. Goldcamp sutured the tonsillar area. Ms. Marek was then transported to Wuesthoff Memorial, where she remained in a comatose state until her death on November 12, 1975. The principal cause of death was hypoxic encephalopathy, lack of oxygen to the brain.

Plaintiff contends the district court misunderstood the testimony relative to the applicable standard of care. At trial plaintiff produced expert testimony that, to accord with the standard of care customarily followed in the community, defendants should have established an airway within four minutes of Ms. Marek's arrival. In its memorandum opinion the trial court discussed this testimony, saying that the expert testified that an airway must be established within four minutes for the patient to survive. Reasoning that Ms. Marek's airway was blocked at least a minute before she arrived at the hospital, the court concluded that, even though defendants were able to intubate her within a minute or two, plaintiff had failed to prove that any action by defendants could have prevented Ms. Marek's death.

We agree with plaintiff that the district court improperly interpreted the expert testimony regarding the four-minute standard.[2] However, we find this error to be harmless because the district court's opinion clearly indicates that the court found that an airway was established within four minutes of her arrival at the hospital.

It is true that the testimony presented by the opposing parties was conflicting. Defendants produced testimony from which the district court could have concluded that an airway was established within a minute of her arrival. On the other hand, plaintiff produced testimony from which the district court could have concluded that fifteen minutes elapsed from the time of arrival to the time an airway was established. It is not for this court to decide which evidence is more credible; "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a); *see, e. g., Chaney v. City of Galveston*, 368 F.2d 774, 776 (5th Cir. 1966). In the absence of clear error, the district court's

dard of care had not been afforded Ms. Marek. But since the desired ventilation was established via the endotracheal tube at the same time it would have been established through surgery, the district court found, and we agree, that the incorrect incision did not proximately cause Ms. Marek's death.

2. It should be noted that in its opinion the district court stated that the only testimony as to the standard of care was that an airway must be established in four minutes for a patient to survive. Although the Government did not offer an expert witness to testify what the standard of care for establishing an airway is, the Government did produce an expert who testified that, in a hypothetical situation incorporating the facts of this case, the standard of proper medical care for establishing an airway was met. Thus, the district court had available evidence from which it could determine that, even if the four-minute standard was not met, the standard of proper medical care for establishing an airway was met.

holding will stand. We have carefully reviewed the record, and we find no such error.

The judgment is AFFIRMED.

FAY, Circuit Judge, dissenting:

The case presents an extremely difficult question for resolution. Mrs. Marek's medical emergency was both massive and complicated. As pointed out by the majority, however, the crucial question before us involves the trial court's rulings as to the "four-minute standard for establishing an airway." All now agree that the district court misunderstood the "four-minute standard" and that such a period was not the minimum lifesaving time from unconsciousness but rather the standard of care applicable to the establishment of an airway after arrival in the emergency room. The majority holds this misunderstanding to be harmless because the district court found an airway was established within four minutes of her arrival at the hospital and that there is evidence to support this finding.

My review of the record convinces me that such a finding, if made, is not only unsupported by but contrary to the overwhelming evidence negating such a possibility. As the majority concedes, there is no question about the activity of Dr. Faber and his attempt to perform a tracheostomy. His conduct fell below all standards and could have only caused a bad situation to become worse. The judgment then rests solely on the activity of Major Least who is a nurse-anesthetist.[1]

When Mrs. Marek arrived in the emergency room it was located in the North wing of the hospital on the first floor. Three employees of the hospital fixed her arrival at 10:30 a. m. Some time elapsed between Mrs. Marek's arrival and the sounding of the "Core Zero". Major Least was taking a patient from the operating room to the recovery room when he heard this signal. The operating room was located in the South Wing of the hospital on the second floor. Major Least had to complete his handling of the patient going to the recovery room, go from one end of the hospital to the other, use either an elevator or stairs to go down one floor, and then into the emergency room. Upon arrival, Major Least surveyed the scene and asked what he could do by way of assistance. Dr. Faber requested help in establishing an airway. Major Least says he then checked Mrs. Marek's mouth, was unable to open it, took an endotracheal tube and began the process of blind nasal intubation. Major Least, in describing this procedure, stated that it took from one-half a minute to one and one-half minutes. The trial court found that Mrs. Marek was intubated within a minute or two of her arrival (R. 294). Such a finding is contrary to the undisputed testimony, physical facts and distances involved and a critical mistake. Major Least continued, and the trial court so found, that it took another minute or two to suction Mrs. Marek to establish ventilation (airway). To suggest that all of this activity occurred within four minutes of Mrs. Marek's arrival in the emergency room is simply wrong. To conclude such as a finding of fact is wrong as a matter of law.[2]

1. A nurse-anesthetist is a nurse specializing in the giving and administering of an anesthesia (R. 169). An anesthesiologist is a medical doctor specializing in this area (R. 170).

2. In footnote number 2 of the majority opinion it is suggested that the trial court had before it conclusory expert testimony that the standard of proper medical care for establishing an airway was met, even though the four-minute standard might not have been met. My brother's logic has me befuddled. The central issue is whether the "four-minute standard" was met. The government's expert did not comment on that question. He was not asked. The basis of his very general conclusionary answer was a review of the hospital records,

which do not start with any time notation until 10:45 a. m., and some additional hypothetical facts totally unrelated to any specific time. The only expert testimony in the record suggests that the proper standard of care required the establishment of an airway within four minutes of Mrs. Marek's arrival in the emergency room. The trial judge did not understand this test, no factual findings were made on this specific question and the uncontradicted testimony of Major Least coupled with known physical distances, makes it manifestly improbable. How one could fail to establish an airway within four minutes of arrival and yet meet some general standard of medical care escapes me?

The hospital records confirm the fallacy of any such reasoning. Knowing that time was of the essence and each minute precious, it was noted that the endotracheal tube was inserted at 10:45 a. m. This hardly satisfies the "four-minute standard" since all agree arrival was very close to 10:30 a. m.

Mrs. Marek was in medical distress. Her husband, a member of the United States Air Force, took her to a government hospital. A government doctor, Dr. Faber, performed below the standard of care required. The other personnel did their best but were not able to overcome or regain the opportunity lost by Dr. Faber's mistake. This conduct contributed to Mrs. Marek's death. The United States is responsible and should respond in compensatory damages. Any other conclusion is clearly erroneous.

I respectfully dissent.